[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13321

_____

MICHAEL SOCKWELL,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:13-cv-00913-WKW-KFP

_____

Before LUCK, ABUDU, and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Michael Sockwell was convicted of murder for pecuniary gain and sentenced to death by the State of Alabama. Sockwell appeals the district court's denial of his 28 U.S.C. § 2254 petition for the writ of habeas corpus challenging his conviction. We hold that the Alabama Supreme Court unreasonably applied clearly established federal law as determined by the Supreme Court of the United States. We also hold that Alabama violated Sockwell's Fourteenth Amendment equal protection rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), by using its peremptory strikes in a discriminatory manner. Accordingly, we reverse the district court's ruling and direct the district court to issue a writ of habeas corpus conditioned on Alabama's right to retry Sockwell.

## I.        Factual Background

In March 1988, Isaiah Harris, a sheriff in Montgomery County, was killed on his way into work. Harris' wife, Louise, was having an affair with Lorenzo McCarter. Louise asked McCarter to find someone to kill Harris so that she could obtain insurance benefit proceeds. McCarter recruited Sockwell and Alex Hood to kill Harris for $100 and promised to pay more money upon completion of the murder.

On the night of the murder, McCarter, Hood, Freddie Peterson, and Sockwell were drinking together. According to Peterson, they left Hood's house to go to the Harrises' subdivision and waited until they received a message on a pager saying, "He's

leaving now." According to Peterson, Sockwell then took a shot-gun and got out of the car near a stop sign, and McCarter drove to a parking lot to wait. No one saw Sockwell shoot Harris, but when he returned to the car, Sockwell suggested that he would get his money. Sockwell testified that McCarter shot Harris, and that he did not know that McCarter planned to kill Harris. Sockwell testified that he did not receive any money to kill Harris, but that he had been given $50 for fixing a car.

## II.    Jury Trial

In 1988, an Alabama grand jury indicted Sockwell for capital murder of Harris on the ground that Sockwell committed the murder for pecuniary gain. Sockwell pleaded not guilty, and the case went to trial in Montgomery County in 1990. In the venire, there were fifty-five potential jurors. Of the fifty-five potential jurors, fourteen were Black.[1] Relevant to this appeal, the state trial court asked each juror how much they had heard about the case and then whether the juror could impose the death penalty.

After voir dire, thirteen potential jurors were struck for cause, leaving forty-two potential jurors. Ten of those remaining

---

[1] The capitalization of Black when referring "to Black people and often especially to African American people or their culture" is "now widely established" in dictionaries and style guides. *See, e.g., Black*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/black; *see also The Chicago Manual of Style* ¶ 8.38 *(*17th ed. 2017*).* ("*Black* is increasingly capitalized when referring to racial or ethnic identity."); Assoc. Press, *Explaining AP Style on Black and White* (July 20, 2020), https://apnews.com/article/archive-race-and-ethnicity-9105661462.

jurors were Black. Each side had fifteen preemptory strikes. Assistant District Attorney Ellen Brooks struck seven of the thirty-two remaining white jurors and eight of the ten remaining Black jurors. Sockwell raised a *Batson* challenge and explained that the State, via Brooks, used "over fifty percent of their strikes to strike [B]lacks" and "in effect, struck eighty percent of all [B]lacks on the venire." Brooks then provided her reasons for striking the jurors, with most of her answers relating to the jurors' positions on the death penalty or their exposure to pretrial publicity.

The focus of Sockwell's *Batson* challenge was on the striking of Eric Davis, a Black male. During his individual voir dire, the state trial court asked

> THE COURT: Have you heard or read from any source anything about these circumstances that we're here today on?
>
> PROSPECTIVE JUROR [DAVIS]: I've heard a little something.
>
> THE COURT: Okay. Have you heard or read or from any other source gained any information as to whether or not this defendant was guilty or not?
>
> PROSPECTIVE JUROR [DAVIS]: Now, I had heard something.
>
> THE COURT: You haven't?
>
> PROSPECTIVE JUROR [DAVIS]: I had heard something.

THE COURT: What did you hear and where was it from?

PROSPECTIVE JUROR [DAVIS]: Oh, I just, um, it was something in the newspaper or something.

THE COURT: Well, what did you hear in the newspaper or read in the newspaper?

PROSPECTIVE JUROR [DAVIS]: Well, I just, you know, just heard talk about what they heard in the newspaper or something like that.  I didn't read it for myself.

THE COURT: From somebody you heard?

PROSPECTIVE JUROR [DAVIS]: Um-hum, yes.

THE COURT: When did you hear that?

PROSPECTIVE JUROR [DAVIS]: It was a while back.

THE COURT: About how long ago?

PROSPECTIVE JUROR [DAVIS]: Several months ago.

THE COURT: Several months ago.  Did you hear specifically about this defendant right here?

PROSPECTIVE JUROR [DAVIS]: No.

THE COURT: Okay.  Do you remember what you heard?

PROSPECTIVE JUROR [DAVIS]: Not exactly.

THE COURT: Can you remember it for me the best you can?

PROSPECTIVE JUROR [DAVIS]: Um, the only thing I recall is just, you know, um, listening at some of the guys, you know that said they had read about it, you know, the incident out on Troy Highway, stuff like that, you know, what had happened and so forth, you know.

THE COURT: Okay.  Do you feel like you'd be able to put aside whatever you heard some of the guys say about what they had read and listen to the facts as they come to you in Court and based on the facts and those alone make a fair, honest, conscientious impartial decision on guilt and non guilt based on those facts and the law instructed by the Court?

PROSPECTIVE JUROR [DAVIS]: Yes, I can.

After this exchange, the court asked about Davis' view of the death penalty:

THE COURT: Because this is a capital case if we were to reach a sentencing stage the possible punishments on a capital offense are life imprisonment without parole and the death penalty, so I need to ask you some questions concerning this matter if we were to get to the sentencing stage.  Are you opposed to the death penalty under any circumstances?

PROSPECTIVE JUROR [DAVIS]: No.

THE COURT: Okay. Are you for the death penalty in all circumstances?

PROSPECTIVE JUROR [DAVIS]: Well, it could go either way.

THE COURT: Okay. You think you could follow your oath and listen to the instructions of the Court and –

PROSPECTIVE JUROR [DAVIS]: Yes, sir. Fair enough to listen to the trial and then come up with a verdict.

THE COURT: Okay. Thank you.

When considering Sockwell's *Batson* motion after voir dire, the state trial court asked Brooks to explain why she chose to strike the fifteen jurors that she did. As it relates to Davis, Brooks stated that Davis "was extremely vague to the Court's questions about what he had heard" about pretrial publicity. Brooks explained that Davis could not remember what he heard. After this, Sockwell sought to obtain Brooks' notes and questionnaires that she referred to when answering the trial court's questions. The state trial court denied that request but allowed Sockwell to keep questioning Brooks about the strike, in which she stated:

> Davis, according to my notes, is a [B]lack male, approximately twenty-three years of age, which would put him very close to the same race, sex, and age of

the defendant. He had said to the Court that he heard a little something. The Court questioned him further and he finally said well, I heard it from the paper or something. The Court questioned him further. He was very vague and unclear in his answer. The Court asked him more about it and he said well, some people were talking about it. I didn't actually read it. He could not remember what had been said nor anything about -- anything further about those. His answer to the death penalty did not give me a lot of clues either way as to how he felt. In fact, I think the words he used were I could go either way.

Sockwell asked Brooks if there were white jurors that she did not strike who had heard something about the case but did not really remember what they heard. Brooks said she would not characterize what was said by other jurors that way. After brief argument from Sockwell, the state trial court denied the *Batson* motion.

Before trial, Sockwell renewed his *Batson* challenge and explained that

[Brooks] gave no reason, no [articulable] reason, and I submit to you that she can give no reason. . . . And I also call to the Court's attention the fact that on the news last night Mr. McPhillips says that this prosecutor, in the last case she tried, in Sims, used fourteen of her strikes in the same fashion. . . . [W]e've got a pattern and practice by the D.A.'s office of excluding [B]lacks for reasons like chewing gum, not dressing properly and being in the wrong neighborhood.

The state trial court again denied the motion.

The jury found Sockwell guilty and recommended a sentence of life imprisonment by a vote of seven to five. But the judge overrode the recommendation and imposed the death penalty.

### III.    Procedural History

Sockwell appealed to the Alabama Court of Criminal Appeals (ACCA), which affirmed Sockwell's conviction and death sentence. Relevant to this appeal, the ACCA found that the state trial court's denial of the *Batson* motion was not clearly erroneous. *Sockwell v. State*, 675 So. 2d 4, 20 (Ala. Crim. App. 1993). The ACCA explained that Davis' "race was part of the reason for striking him" but that Davis' vague responses as "to what information about the case and from where he had received information about the case, is a sufficiently race-neutral reason for a peremptory challenge." *Id.*

Sockwell appealed. A divided Alabama Supreme Court affirmed the ACCA—holding its conclusion about Sockwell's *Batson* challenge was correct but "its rationale was not." *Ex parte Sockwell*, 675 So. 2d 38, 41 (Ala. 1995). The court explained it did not agree with the ACCA "that the prosecutor's opening remark identifying [Davis] as a [B]lack man was given as a *reason for striking him* from the venire." *Id.* at 40. Instead, in the "context of the entire exchange," the prosecutor's identification of Davis as a Black male "was merely a descriptive identification of the veniremember based on the prosecutor's notes." *Id.* "When the prosecutor gave the reasons for striking a veniremember, either white or [B]lack,

she first prefaced her remarks by stating the venire member's race and sex." *Id.*

The court found that "[t]he only *reasons* the prosecutor gave for striking [Davis] were his vagueness and lack of candor in stating what he had already heard about the trial, from what source he has gotten this information, and whether he could be willing to recommend the death penalty." *Id.* The court specifically disagreed with the ACCA's logic that "a non-race-neutral *reason* given for a peremptory strike [would] 'cancel out' a race-based reason." *Id.* at 41. Instead, the Alabama Supreme Court held that "the mere *mention* of race . . . does not necessarily establish that a peremptory strike was based on a racially motivated reason and was the product of purposeful discrimination." *Id.*

In December 2013, Sockwell filed his habeas petition in the Middle District of Alabama, asserting his *Batson* claim. Ten years later, the district court denied Sockwell's request for relief. *Sockwell v. Hamm*, No. 2:13-CV-913-WKW, 2023 WL 6377645, at *1 (M.D. Ala. Sept. 29, 2023). The court found the strike of Davis "problematic" but noted that the Alabama Supreme court could reasonably conclude that Brooks' "racial comparison was incidental, surplusage, or simply an extemporaneous, if ill-advised, descriptive observation that Davis and [Sockwell] were of the same race, sex, *and* age, but that this observation conveyed no particular animus toward any of those traits." *Id.* at *18. The court also found that nothing in the Alabama Supreme Court's opinion showed that it had not considered all relevant circumstances, and the Alabama

Supreme Court did not unreasonably apply *Batson*'s third step. *Id.* at \*19–24. Because Sockwell made a substantial showing of the denial of a constitutional right, the district court granted a certificate of appealability as to whether Alabama exercised its peremptory challenge of Davis in a racially discriminatory manner. *Id.* at \*49. Sockwell timely appealed.

## IV.     Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs our review of the Alabama Supreme Court's *Batson* analysis. *See* 28 U.S.C. § 2254. AEDPA generally establishes a "highly deferential" standard for reviewing a state court's *Batson* rulings. *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1192, 1207 (11th Cir. 2013).

"If we determine that AEDPA deference does not apply [to the state court's *Batson* analysis], we must undertake a *de novo* review of the claim." *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1250 (11th Cir. 2013).

## V.     Applicable Law

In *Batson*, the Supreme Court ruled that "the Equal Protection Clause forbids the prosecutor [from] challeng[ing] potential jurors solely on account of their race or on the assumption that [B]lack jurors as a group will be unable impartially to consider the State's case against a [B]lack defendant." 476 U.S. at 89. *Batson* "stressed a basic equal protection point: In the eyes of the Constitution, one racially discriminatory peremptory strike is one too

many."[2] *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019). *Batson*, decided in 1986, was established federal law at the time of Sockwell's trial in 1988 and when the Alabama Supreme Court decided Sockwell's direct appeal in 1995.

*Batson* established a three-step inquiry to evaluate the prosecutor's use of peremptory strikes:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (*Miller-El I*) (citing *Batson*, 476 U.S. at 96–98) (internal citations omitted).

Neither party disputes that Sockwell made a prima facie case that the peremptory strike on Davis was based on race. Instead, the parties dispute the Alabama Supreme Court's determinations on *Batson*'s second and third steps. We address each step in turn.

---

[2] We have also emphasized that under *Batson* venire members "are entitled not to be struck for racial reasons, and [B]lack defendants are entitled to be tried in a system free of racially exclusionary practices." *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986).

## VI.    *Batson*'s Second Step

Sockwell argues that the Alabama Supreme Court made an unreasonable determination of fact under 28 U.S.C. § 2254(d)(2) by finding that (1) the comparison between Sockwell and Davis was merely descriptive and (2) Brooks gave a race-neutral reason for striking Davis. Sockwell asserts that Brooks' statement that "Davis, according to my notes is a [B]lack male, approximately 23 years of age, which would put him very close to the same race, sex and age of the defendant" is an explicitly racial reason for striking Davis.

A state habeas court's findings of fact are presumed to be correct and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quoting 28 U.S.C. § 2254(d)(2)). "Depending on the importance of the factual error to the state court's ultimate decision, that decision might still be reasonable." *Id.* (internal quotation marks omitted).

*Batson*'s first and second steps "govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim" when it reaches *Batson*'s third step. *Johnson v. California*, 545 U.S. 162, 171 (2005). The second step in the *Batson* inquiry "does not demand an explanation

that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam). At this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion).

The question for this court is whether the Alabama Supreme Court reasonably reached its conclusion that Brooks proffered a race-neutral reason under *Batson*'s second step. The Alabama Supreme Court credited as the "only *reasons*" for Brooks' strike was Davis' "vagueness and lack of candor in stating what he had already heard about the trial, from what source he has gotten this information, and whether he could be willing to recommend the death penalty." *Ex parte Sockwell*, 675 So. 2d at 40. In doing so, it rejected that "the prosecutor's opening remark identifying [Davis] as a [B]lack man was given as a *reason for striking him*." *Id*. The Alabama Supreme Court erred in finding that this statement by Brooks was merely a descriptive identification.

We find the Alabama Supreme Court's characterization of Brooks' statement as "merely descriptive" as unpersuasive as the district court did. More than stating Davis' race, Brooks compared Davis' race to Sockwell's. But that does not mean that the Alabama Supreme Court's underlying determination at this stage of the *Batson* inquiry was unreasonable. Considering that *Batson*'s second step is a low burden, so much so that the proffered race-neutral reason need not be "persuasive, or even plausible," the Alabama

Supreme Court's determination that Brooks met this low bar is not unreasonable despite the factual error. *Purkett*, 514 U.S. at 767–68. Still, Sockwell's argument about the prosecutor's comparison to the stricken juror, Davis, has force. The language should be considered with all the relevant circumstances when we "determine the persuasiveness of the defendant's constitutional claim" at *Batson*'s third step. *Johnson*, 545 U.S. at 171.

## VII.  *Batson*'s Third Step

Sockwell first argues that the Alabama Supreme Court unreasonably applied clearly established Supreme Court precedent by failing to explicitly perform the third step analysis and to determine whether he established purposeful discrimination. Instead, the court "stopped immediately after step 2" and deferred to the trial court's finding that Brooks' stated reasons for the Davis strike were race neutral. Next, he argues that even if the Alabama Supreme Court implicitly performed the required analysis, it unreasonably applied *Batson*'s third step by failing to consider all of the relevant circumstances.

Sockwell's first argument is foreclosed by this court's precedent. We do not require "courts to show their work in *Batson* decisions by mentioning every relevant circumstance." *King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 869 (11th Cir. 2023). State courts are not required to list each fact or argument they considered. *See Lee*, 726 F.3d at 1212. Thus, we presume that the Alabama Supreme Court implicitly considered the relevant circumstances.

Next, Sockwell argues that, even if it does not do so explic-itly, the Alabama Supreme Court is not absolved from its duty to properly consider all of the relevant circumstances at *Batson*'s third step to determine whether Sockwell established purposeful dis-crimination.  After careful review, we agree that the Alabama Su-preme Court's implicit application of *Batson*'s third step was an un-reasonable application of clearly established law.

### A.     AEDPA Review

When determining whether the defendant has established purposeful discrimination, "the decisive question will be whether [the prosecutor's] race-neutral explanation . . . should be believed." *Hernandez*, 500 U.S. at 365.  In addressing this question, "a court must undertake a sensitive inquiry into such circumstantial and di-rect evidence of intent as may be available," *Batson*, 476 U.S. at 93 (internal quotation marks omitted), to determine "whether the op-ponent of the strike has carried his burden of proving purposeful discrimination," *Purkett*, 514 U.S. at 768.

The defendant may present: (1) "statistical evidence about the prosecutor's use of peremptory strikes against [B]lack prospec-tive jurors as compared to white prospective jurors in the case;" (2) "evidence of a prosecutor's disparate questioning and investiga-tion of [B]lack and white prospective jurors in the case;" (3) "side-by-side comparisons of [B]lack prospective jurors who were struck and white prospective jurors who were not struck in the case;" (4) "a prosecutor's misrepresentations of the record when defend-ing the strikes during the *Batson* hearing;" (5) "relevant history of

the State's peremptory strikes in past cases;" or (6) any "other relevant circumstances that bear upon the issue of racial discrimination." *Flowers*, 588 U.S. at 302.

Under AEDPA, a state court's finding of no purposeful discrimination is entitled to deference unless it is: (1) "contrary to, or involved an unreasonable application of," *Batson* and its progeny, or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1)–(2).

"Where the concern is that a state court failed to follow *Batson*'s three steps, the analysis should be under AEDPA § 2254(d)(1)." *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1256 (11th Cir. 2009). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Further, "[t]he decision must be 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement.'" *Pye*, 50 F.4th at 1034 (quoting *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam)).

The Supreme Court has clearly articulated that "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Batson*, 476 U.S. at 96. Our decision in *Lee* discussed the AEDPA standard for evaluating whether the state court failed to consider the totality of "all relevant circumstances" under *Batson*. We held that an "unreasonable application" results where there are "explicit racial statements and strong evidence of discriminatory purpose," such that no reasonable and fairminded jurist could have considered "all relevant circumstances" and find no *Batson* violation. *Lee*, 726 F.3d at 1213.[3]

Sockwell points us to the following "relevant circumstances," that he claims the Alabama Supreme Court ignored:

---

[3] *Lee* summarized our cases applying *Batson*. Specifically, the opinion pointed to our decisions in *McGahee* and *Adkins* for examples of explicitly racial justifications for striking jurors. 726 F.3d at 1213. In *McGahee*, we noted the State's claim that several Black jurors were struck due to "low intelligence" was "a particularly suspicious explanation given the role that the claim of 'low intelligence' has played in the history of racial discrimination from juries." 560 F.3d 1252, 1265 (11th Cir. 2009). We also agreed that the State's reasoning for striking the only remaining Black juror because it "did not want to leave him individually" could "be read only to mean that the State did not want to leave [him] as the sole [B]lack juror on the panel." *Id.* at 1264. The "statement by the prosecutor that a juror was struck because of his race is a 'relevant circumstance' in determining whether *Batson* has been violated." *Id.* In *Adkins*, we found that the state court unreasonably applied *Batson* when it failed to consider key facts such as "the fact that the prosecution explicitly noted the race of every [B]lack venire member (and only [B]lack venire members) on the jury list" used in jury selection, and "the fact that specific proffered reasons provided by the prosecutor were incorrect and/or contradicted by the record." 710 F.3d 1241, 1252 (11th Cir. 2013).

(1) Brooks' relevant history of preemptory strikes in past cases that were found to have violated *Batson*; (2) the "statistical evidence about the prosecutor's use of peremptory strikes against [B]lack prospective jurors as compared to white prospective jurors in the case;" (3) Brooks' reasoning for striking Davis as compared to two white jurors who were not struck; and (4) Brooks' response to questions about why she struck Davis, which bears "upon the issue of racial discrimination." *See Flowers*, 588 U.S. at 302. We agree with Sockwell that the Alabama Supreme Court's decision was an unreasonable application of *Batson* and its progeny. No reasonable and fairminded jurist could have considered "all relevant circumstances" present here and find no *Batson* violation. *See Lee*, 726 F.3d at 1228.

### i.    History of Peremptory Strikes in Past Cases

*Batson* challengers may present evidence of a "relevant history of [the prosecutor's] peremptory strikes in past cases." *Flowers*, 588 U.S. at 302. Relevant history of prior peremptory strikes based on race bears on the question of present discrimination. *See id.* Here, Brooks had a significant history of striking jurors in a racially discriminatory manner right before and during Sockwell's trial in 1990. Both the ACCA and Alabama Supreme Court found several instances of Brooks striking Black jurors in violation of *Batson* starting in 1988.[4] *Sims v. State*, 587 So. 2d 1271, 1277 (Ala. Crim. App.

---

[4] In two cases, Alabama courts identified Brooks as the prosecutor who struck most if not all the Black jurors. In *Ex parte Bird*, the Alabama Supreme Court noted "a pattern in the use of peremptory strikes by the Montgomery County

1991) ("A number of cases prosecuted in Montgomery County have been reversed because of a *Batson* violation."). We discuss several of those cases in turn.

First, in 1985 Samuel Williams was convicted of drug offenses, and he raised a *Batson* challenge before the ACCA. *Williams v. State*, 530 So. 2d 881, 883–86 (Ala. Crim. App. 1988). Brooks struck all the potential Black jurors. *Id.* at 883–85. The ACCA agreed with the trial court that Williams' *Batson* objection was

---

District Attorney's office" to remove Black jurors—specifically in "a number of cases . . . prosecuted by Bruce Maddox and Ellen Brooks." 594 So. 2d 676, 681 (Ala. 1991). For example, "[i]n *Williams v. State,* Ms. Brooks struck 100% of the [B]lack jurors from the venire." *Id.* at 681 (citing 530 So. 2d 881 (Ala. Crim. App. 1988)).

In at least two other cases, Brooks was not named directly but we can safely deduce that she was involved. At Sockwell's trial, his attorneys pointed to *Sims v. State*—a case that Brooks prosecuted the prior week—where she struck fourteen of the sixteen Black jurors. 587 So. 2d 1271, 1275–78 (Ala. Crim. App. 1991).

Reviewing Brooks' jury selection in *Sims*, the ACCA concluded that "the reasons offered by the prosecutor for her remaining strikes present serious doubts to this court as to their validity." 587 So. 2d at 1276. The court observed that "[t]he same prosecutor involved in the present case, was also involved in *Powell*, *Williams*, *Warner*, and *Parker*. Of these cases, three were reversed for *Batson* violations." *Id.* at 1277 (referencing *Powell v. State,* 548 So.2d 590 (Ala. Crim. App. 1988), *aff'd*, 548 So.2d 605 (Ala. 1989); *Williams*, 530 So. 2d 501; *Warner v. State,* 594 So. 2d 664 (Ala. Crim. App. 1990); and *Parker v. State,* 568 So.2d 335, 338 (Ala. Crim. App. 1990)). The ACCA also cited testimony "from several local attorneys" who "had participated in trials prosecuted by the same assistant district attorney," including *Powell*, *Williams*, and *Warner*. *Sims*, 587 So. 2d at 1277. The defendant in the *Warner* case was a co-defendant in *Bird*. *See Bird*, 594 So. 2d at 678; *Warner*, 594 So. 2d at 666.

untimely because it had been made after the jury had been sworn in, and he failed to justify the delay. *Id.* 885–86.

But this was not Williams' only appeal to the ACCA based on Brooks' striking of Black jurors. In 1988, on appeal from Williams' conviction for a different drug offense, the ACCA found that Brooks' explanation for striking all nine Black prospective jurors "did not meet the requirements of *Batson*" and returned the case to the trial court. *Williams v. State*, 548 So. 2d 501, 503 (Ala. Crim. App. 1988). The court specifically noted that those proceedings needed to comply with *Batson*. *Id.* On remand, the state trial court held an evidentiary hearing and found that Brooks met her burden to make "a bona fide or legitimate showing that her use of the peremptory strikes was for reasons other than race." *Id.* at 504–06. But on appeal, the ACCA found Brooks' supposed race-neutral reasons for striking most of the Black jurors were not "specific, bona fide, or legitimate," and thus violated *Batson*. *Id.* at 507.[5]

---

[5] The dissenting opinion points out that Williams' trial occurred in 1985, one year before the Supreme Court decided *Batson*. But *Batson* was "a new rule for the conduct of criminal prosecutions" that was "to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). That "Brooks could not have purposefully violated a Supreme Court decision that did not exist until nearly a year later," does not change the fact that Brooks purposefully struck Black jurors in the cases she prosecuted. Brooks' pattern of discriminatory strikes continued even after *Batson*, reinforces the conclusion that her discriminatory jury selection was not due to a lack of notice about what the Equal Protection Clause requires.

Second, in 1987, Timothy Powell was convicted of robbery and murder. He raised a *Batson* challenge because Brooks struck all the potential Black jurors, using thirteen of the State's sixteen peremptory challenges. *Powell v. State*, 548 So. 2d 590, 592–93 (Ala. Crim. App. 1988), *aff'd sub nom. Ex parte Powell*, 548 So. 2d 605 (Ala. 1989). The ACCA noted that the trial court clearly erred in finding that many reasons that Brooks gave for striking Black jurors were sufficiently race-neutral. *Id.* at 594. "The State simply did not remove white persons for the same reasons given by the State for removing [B]lacks." *Id.* at 593.

Third, in 1987, Terry Bird was convicted of capital murder. *Ex parte Bird*, 594 So. 2d 676, 678 (Ala. 1991). Bird presented evidence that Brooks used "85% of her peremptory challenges, that is, 17 of 20 strikes, to eliminate 89% of the [B]lack veniremembers" for reasons unsupported by the record. *Id.* at 681. In 1991, the Alabama Supreme Court found Brooks violated *Batson*. *Id.* at 678. The court noted that "the venire consisted of 52 prospective jurors. The 19 [B]lack veniremembers comprised 36% of the venire. However, the fact that only one [B]lack juror was ultimately seated on the jury meant that [B]lacks comprised only 8% of the trial jury." *Id.* at 680.

Fourth, Brad Haywood Sims was convicted of a drug offense, and during voir dire, Brooks struck fourteen of the sixteen potential Black jurors. *Sims v. State*, 587 So. 2d 1271, 1272, 1275–76 (Ala. Crim. App. 1991). Although the jury included two Black jurors, the ACCA noted "[t]he fact that two [B]lacks actually sat on

the jury is not proof that no racial discrimination occurred." *Id.* at 1277. Ultimately, the ACCA found that Brooks violated *Batson* by striking several Black jurors again for traits and reasons that potential white jurors provided yet were not challenged. *Id.* at 1277–78.[6] The *Sims* case had only been conducted the week before Sockwell's, and Sockwell's counsel brought up the *Sims* case in its argument to reopen the *Batson* challenge before trial.[7]

Brooks' history of *Batson* violations is germane when considering the relevant circumstances at *Batson*'s third step.[8]  "We

---

[6] The ACCA expressly considered Brooks' history of excluding Black jurors. *Sims v. State*, 587 So. 2d 1271, 1277 (Ala. Crim. App. 1991). "The record also contains testimony at the *Batson* hearing from several local attorneys. These attorneys had participated in trials prosecuted by the same assistant district attorney as the one in the present case. All of the attorney-witnesses testified that in each instance, the prosecutor had excluded approximately 80% of the [B]lack veniremembers." *Id.*

[7] Sockwell's counsel asked to inquire into the *Sims* trial, but the state trial judge denied that request.

[8] We also must note that Brooks was not the only culprit within the Montgomery County District Attorney's office. Bruce Maddox, who also engaged in striking Black jurors in a racially discriminatory manner, was called out in *Bird*. *See Bird*, 594 So. 2d at 681 (pointing to Maddox's high strike rate of Black jurors in two cases). After *Bird*, the Alabama Supreme Court again had to chastise Maddox for his discriminatory striking of twenty-four of the twenty-seven potential Black jurors in *Ex parte Yelder*. 630 So. 2d 107, 108 (Ala. 1992). The Alabama Supreme Court appeared exasperated by the fact that Brooks was still striking potential Black jurors for "whimsical, *ad hoc* excuses" that it had previously rejected. *Id.* at 109 (discussing the prosecutor's "explanations" for striking Black jurors included that they had the same name as someone allegedly prosecuted by the district attorney's office, the prosecutor's "gut reaction," "body language," and alleged "communication difficulties" that

cannot ignore that history." *Flowers*, 588 U.S. at 307. As a result, Brooks' pattern of *Batson* violations shows that her strikes in Sockwell's trial—which occurred around the same time as these state court cases—were "motivated in substantial part by discriminatory intent." *Id*. at 305.

### ii.    Statistical Evidence

As *Batson* explained: "total or seriously disproportionate exclusion of Negroes from jury venires is itself such an unequal application of the law . . . as to show intentional discrimination." 476 U.S. at 93 (internal quotations and citation omitted). Further, "a 'pattern' of strikes against [B]lack jurors included in the particular venire might give rise to an inference of discrimination." *Id*. at 97; *see also Miller-El I*, 537 U.S. at 342 ("[T]he statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason," where the prosecution struck "91%" of the eligible Black venire members with ten of their fourteen peremptory strikes.).

> [I]n the statistical analysis courts must consider the statistics in the context of other factors in a case, such as: the racial composition of the venire from which the jurors were struck, the racial composition of the ultimate jury, the substance of the voir dire answers

---

weren't supported by the record). The Alabama Supreme Court stated, "We regret that the conduct of the prosecution has, because of actions taken on the basis of race, once again necessitated a retrial, thus creating an additional strain on the judicial and economic resources of this state." *Id*. at 110.

of jurors struck by the State, and any other evidence
in the record of a particular case.

*Lee*, 726 F.3d at 1224.

The racial composition of Sockwell's jury pool consisted of
ten Black jurors (24% of the total jury pool) and thirty-two white
jurors (76% of the total jury pool).  During the peremptory striking
process, Brooks used the State's fifteen peremptory strikes to re-
move eight qualified Black jurors and seven qualified white jurors.
But after Brooks' strikes, 17% of the jurors were Black (i.e., only
two Black jurors) and 83% were white (i.e., ten white jurors).
Brooks struck 80% of the qualified Black jurors while striking only
22% of the qualified white jurors.  The number of Black jurors de-
creased 50%, while the number of white jurors increased.[9]

This statistical information establishes a pattern of striking
qualified Black jurors far more often than qualified white jurors and
provides strong evidence of the disproportionate exclusion of Black
jurors against which *Batson* cautioned.[10]  *See McGahee*, 560 F.3d at
1265.

––––––––––––––––

[9] In the other cases in which Alabama courts found *Batson* violations, Brooks
struck between 81% and 100% of Black jurors.

[10] Sockwell also points to other circuits' use of the "challenge rate," which
compares the proportion of the party's strikes against a racial group to the
proportion of that group in the jury.  *See, e.g., Jones v. West*, 555 F.3d 90, 98 (2d
Cir. 2009).  Sockwell asserts that Brooks' challenge rate for Black jurors was
223% while her challenge rate for white jurors was only 61% at his voir dire.
Although this court's opinion in *Adkins* does not specifically mention the chal-
lenge rate, Sockwell states that after doing the calculation himself, the

### iii.    Reasoning for Striking Davis

Third, Sockwell compares Davis with two white jurors—Lisa Burch and Peggy McFarlin—who were not struck for giving vague answers about pretrial publicity. During voir dire, Davis stated that he could not remember what he heard about the trial. Both Burch and McFarlin also did not remember in detail what they had heard. This comparison suggests that the vagueness of Davis' answer was only pretextual because Brooks did not strike Burch or McFarlin. The contradiction that Brooks did not strike two white jurors who explicitly stated they did not know what they heard about the case is highly relevant when conducting the *Batson* step three analysis.[11]

### iv.    Brooks' Response About the Strike

Sockwell points out that Brooks directly compared Davis to Sockwell,[12] by stating that "Davis, according to my notes, is a [B]lack male, approximately twenty-three years of age, which would put him very close to the same race, sex, and age of the

---

challenge rate there was 218% for Black jurors, which is five percent less than what happened here. *See Adkins v. Warden*, 710 F.3d 1241, 1252–53 (11th Cir. 2013). The high differential in challenge rates here further persuades us that Brooks engaged in a discriminatory pattern of striking jurors.

[11] Brooks also stated that Davis' view on the death penalty was another reason for striking him, but that is not addressed by the Alabama Supreme Court.

[12] Sockwell's argument at *Batson's* second step focuses extensively on this exchange, and while we find that Sockwell did not meet his burden at that step, that does not foreclose us from considering Brooks' response in the relevant circumstances discussion.

defendant." "The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." *Batson*, 476 U.S. at 97–98; *see also Flowers*, 588 U.S. at 298–99 (summarizing key points from *Batson*, including that striking a Black juror on an assumption or belief that the Black juror would favor a Black defendant is impermissible). This comparison is relevant because it supports that Brooks felt as if Davis "would be partial to [Sockwell] because of their shared race." *Batson*, 476 U.S. at 97.

\*      \*      \*

These four relevant factors reinforce each other to show strong evidence of racial discrimination. Even allowing for the deference afforded to the Alabama Supreme Court under AEDPA, a reasonable and fair-minded jurist could not have considered all of this evidence and concluded that *Batson* was not violated. Denying *Batson* relief, despite "the explicit racial statements and strong evidence of discriminatory purpose," is an unreasonable application of the law. *See Lee*, 726 F.3d at 1213. Alabama state courts found that Brooks repeatedly and purposefully struck Black jurors, making only dubious and capricious excuses. *See Bird*, 594 So. 2d at 685. Along with the extensive statistical data of striking Black jurors in Sockwell's case and Brooks' explicitly race-based reasoning for removing Davis, confirms Brooks' racially discriminatory intent.

To be sure, a state court need not "discuss every fact or argument to be a reasonable application of *Batson* under § 2254(d)," *Lee*, 726 F.3d at 1214, and we must not base our holding on our own independent judgment that the state court merely applied clearly established federal law incorrectly, *Williams*, 529 U.S. at 411. Still, when there is truly an "abundan[ce of] racial discrimination evidence," we may find the state court's *Batson* decision was indeed unreasonable. *Lee*, 726 F.3d at 1214.

Sockwell presents "strong evidence of discriminatory purpose." *See id.* at 1223. No reasonable and fairminded jurist could have considered "all relevant circumstances" and still found no *Batson* violation.[13] *See id.* at 1213. Thus, the Alabama Supreme Court acted unreasonably in applying *Batson*.

---

[13] The dissenting opinion dives through several Eleventh Circuit cases to prove its point that when considering all relevant circumstances, "reasonable and fairminded jurists could conclude there was no *Batson* violation." While the dissenting opinion details troublesome relevant circumstances—instances upon instances of prosecutors purposefully striking huge swath of Black jurors and flimsy reasons for striking those Black jurors—none of those cases involved a direct comparison of the defendant to a stricken Juror *and* a state supreme court calling out the prosecutor by name and the office for serial *Batson* violations.

We do note that this court's decision in *King* may be the closest case, but we find *King* to be distinguishable. *King* featured a prosecutor with one previous *Batson* violation, two soliloquies by the prosecutor that showed animosity towards having to comply with *Batson*, unsupported reasons for striking Black jurors, and statistical evidence. *King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 870–71 (11th Cir. 2023). But, here, there are more relevant circumstances that skew in Sockwell's favor. First, we have more than one previous *Batson*

### B.     *De Novo Review*

When we have determined that a state court decision is an unreasonable application of federal law under AEDPA, we are unconstrained by § 2254's deference. *McGahee*, 560 F.3d at 1266. We now review de novo the record below to determine whether the State, via Brooks, violated *Batson* during jury selection.

As noted above, the record overflows with relevant circumstances that weigh against Brooks' proffered race-neutral reasons for exercising the challenged peremptory strike. The statistical evidence in Sockwell's case is strong. *See Batson*, 476 U.S. at 97 (considering the statistical evidence about a prosecutor's strikes of Black prospective jurors versus white prospective jurors). And in other cases in which the Alabama courts found *Batson* violations, Brooks struck Black jurors at a high rate. Those cases also show a pattern and practice of Brooks striking Black jurors because Brooks' strikes were found discriminatory by state courts from 1988 through 1992.

---

violation with multiple Alabama appellate courts calling out Brooks and the Montgomery County District Attorney's Office for serial *Batson* violations during the relevant time. *See, e.g., Bird*, 594 So. 2d at 681. Second, Brooks compared Sockwell to Davis, stating she struck him for being the same race as the defendant, which is exactly what *Batson* cautioned against. *See Batson*, 476 U.S. at 97 ("[T]he Equal Protection Clause forbids . . . the States to strike [B]lack veniremen on the assumption that they will be biased in a particular case simply because the defendant is [B]lack."). Add in the statistical evidence and the unsupported reasons for striking Davis, and Sockwell's case is more akin to cases where defendants overcame AEDPA by showing the state courts had unreasonably applied *Batson*. *See McGahee*, 560 F.3d at 1264–65; *Adkins*, 710 F.3d at 1253.

*Flowers*, 588 U.S. at 302 (finding that the relevant history of the State's peremptory strikes supports a *Batson* claim). And Brooks compared Davis to Sockwell for no legitimate reason, instead suggesting that due to their shared characteristics Davis would be partial to Sockwell. *See Batson*, 476 U.S. at 89.

Brooks said that she struck Davis because he could not remember specifics about the pre-trial publicity, yet there were white jurors who could not remember what they heard about the case, and Brooks did not strike them. During his individual voir dire, Davis explained that he had heard something about the incident, but he was vague as to where he had heard about the case. After further questioning, Davis explained that he heard people talking about what they had read in the newspaper. And, as noted above, there were two white jurors who were not struck despite being vague about what they heard about the case. A comparison of the voir dire shows that like Davis, the white jurors could not tell Brooks what they had heard about the trial.

For McFarlin, the state trial court asked about her access to pretrial publicity where she noted that she heard something about the matter in the paper. But in response to the state trial court's question about whether she "read *or* heard anything about it, or from any source gained any information as to whether or not this defendant was guilty or not guilty," she answered, "I can't -- I don't remember. I just barely remember the story, but I don't remember how it ended." In following up, the state trial court asked if she had "any opinion toward whether or not this defendant would be

guilty or not guilty right now from any source." In response, she said, "I don't really know what the story was really about, really. I just read a little bit of it in the paper and I don't know what he's done." Ultimately, like Davis, McFarlin said that she could put aside anything she might have heard and could "make a fair, impartial, and just decision in this case."

For Burch, the state trial court asked about her access to pretrial publicity where she said that a while back, she "heard it on the news, but it was, you know, just briefly." When asked if she could set aside anything she may have heard, she responded yes, like Davis, but again reiterated that she couldn't "even remember in full detail what I heard at that time."

Although Davis may have been a little vaguer than the two white jurors, the law does not require that "similarly situated" jurors are "identical in all respects." *Miller-El v. Dretke*, 545 U.S. 231, 247 n.6 (2005) (*Miller-El II*). Indeed, "[a] *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." *Id.*; *see also Flowers*, 588 U.S. at 311–12 (citing *Miller-El II* and affirming that "a defendant is not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent").

Brooks also stated that Davis' view on the death penalty was another reason for striking him, but the Alabama Supreme Court did not address it. Our de novo review of the record does not support that argument. Although there was some initial confusion

about how Davis felt about implementing the death penalty, it became very clear after the trial judge followed up that Davis could vote for the death penalty if the circumstances warranted it. Specifically, Davis stated that he could be "[f]air enough to listen to the trial and then come up with a verdict."

"A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El II*, 545 U.S. at 252. Thus, Sockwell met his burden at *Batson*'s third step to demonstrate Davis' exclusion from the jury was purposeful discrimination.

Brooks struck eight out of the ten Black jurors from Sockwell's jury. A side-by-side comparison of individual reasons for striking Davis, a Black juror, with the reasons for not striking white jurors, Burch and McFarlin, reveals a substantial likelihood of race-based considerations in the exercise of those strikes. In sum, the overwhelming evidence in this record compels a finding that Brooks' use of her peremptory strike to dismiss Davis violated Sockwell's rights under the Equal Protection Clause and clearly established federal law under *Batson*.

## VIII.   Harmless Error

The Commissioner argues that the Supreme Court's decision in *Brown v. Davenport* requires Sockwell to show that "'law and justice' require relief" for this court to grant habeas relief, even if he overcomes AEDPA. 596 U.S. 118, 134 (2022). The

Commissioner asks us to interpret this requirement as adding a harmless error analysis to *Batson* claims.[14]

We decline to do so.  This court has noted previously that the Supreme Court has not suggested that *Batson* violations are subject to harmless error review.  *See Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1316–17 (11th Cir. 2003) (per curiam).  Since this court decided *Davis* in 2003, the Supreme Court has continued to reverse convictions even when only one or two potential jurors are struck in violation of *Batson*, no matter if it affected the outcome of the trial.  *See Flowers*, 588 U.S. at 315–16; *Foster v. Chatman*, 578 U.S. 488, 514 (2016); *Snyder v. Louisiana*, 552 U.S. 472, 477–78, 486 (2008).  "Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process."  *Flowers*, 588 U.S. at 301.

## IX.    Conclusion

Accordingly, the district court's order denying Sockwell's federal habeas petition is **REVERSED**, and the case is **REMANDED** to the district court with instructions to issue the

---

[14] Since *Brown* was released, other circuits have applied the "law and justice" requirement when a petitioner not only has to overcome AEDPA deference but an *existing* harmless error analysis.  *See Jewell v. Boughton*, 90 F.4th 1199, 1203–06 (7th Cir. 2024) (Confrontation Clause); *Neal v. Vannoy*, 78 F.4th 775, 796 (5th Cir. 2023) (ineffective assistance of counsel).  This trend supports that *Brown* does not impose a *new* harmless error requirement in habeas cases.

34                    Opinion of the Court                    23-13321

writ of habeas corpus conditioned upon the right of Alabama to retry Sockwell.

**REVERSED and REMANDED.**

LUCK, Circuit Judge, dissenting:

Michael Sockwell blew "half of" Montgomery County Deputy Sheriff Isaiah Harris's "face off" with a shotgun as the deputy was driving to his shift at the police station. *Sockwell v. State* (*Sockwell I*), 675 So. 2d 4, 12–13 (Ala. Crim. App. 1993), *aff'd*, *Ex parte Sockwell* (*Sockwell II*), 675 So. 2d 38 (Ala. 1995). Sockwell murdered Deputy Harris for money. *Id*. He confessed in a recorded statement to the police. He confessed to his friend. *Id*. at 13. And his coconspirator confessed and implicated him. *See id*. at 12–13.

At Sockwell's trial thirty-five years ago, Ellen Brooks, the prosecutor, used a peremptory challenge to strike veniremember Eric Davis, a black male, based on Juror Davis's "vagueness and lack of candor in stating what he had already heard about the trial, from what source he ha[d] gotten this information, and whether he could be willing to recommend the death penalty." *Sockwell II*, 675 So. 2d at 40. Applying the third step of the three-step *Batson v. Kentucky*, 476 U.S. 79 (1986) inquiry, the Alabama Supreme Court found that the peremptory strike of Juror Davis was not the result of purposeful discrimination. *Sockwell II*, 675 So. 2d at 42.

In all but the most "extreme" cases, we would defer to the state court's finding. *King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 869, 873 (11th Cir. 2023). But the majority opinion relies on three premises to strip the Alabama Supreme Court of the deference its finding is due under the Anti-Terrorism and Effective Death Penalty Act (AEDPA). The *first premise* is that there were four relevant circumstances the Alabama Supreme Court had to consider in

its *Batson* third step inquiry: (a) Ms. Brooks's history of peremptory strikes based on race; (b) statistical evidence of a pattern of striking qualified black veniremembers; (c) Ms. Brooks's reasons for striking Juror Davis compared to her decision not to strike two white jurors; and (d) Ms. Brooks's response to Sockwell's *Batson* objection explaining why she struck Juror Davis. The *second premise* is that the Alabama Supreme Court unreasonably applied the *Batson* third step inquiry because it ignored these four relevant circumstances. And the *third premise* is that no fairminded jurist could have considered these four relevant circumstances and concluded, as the Alabama Supreme Court did, that the peremptory strike of Juror Davis was not the result of purposeful discrimination. Stripped of deference, the majority opinion reviews the cold record de novo, conducts its own *Batson* analysis thirty-five years removed from the courtroom, rejects the state court's no-purposeful-discrimination finding, and orders the district court to grant the habeas writ so the state can figure out a way to retry Sockwell almost four decades after the murder.

The problem with the majority opinion is that each of its three premises is flawed. *First*, the four circumstances are not nearly as relevant as the majority opinion says they are. The majority opinion misstates some relevant circumstances and overlooks the record as to others. *Second*, the Alabama Supreme Court did not unreasonably apply the *Batson* third step inquiry because it did not ignore the four relevant circumstances. It considered all the relevant circumstances proffered by Sockwell in finding no purposeful discrimination in striking Juror Davis. And *third*, even with

the four relevant circumstances, a fairminded jurist could conclude that striking Juror Davis from the jury was not based on purposeful discrimination.  A fairminded jurist already has.  *See, e.g.*, *id.* at 868–73.

1.  *The Four Circumstances Are Not Nearly as Relevant as the Majority Opinion Says They Are*

The majority opinion's first premise is that there were four relevant circumstances that the Alabama Supreme Court had to consider in its *Batson* finding:  (a) Ms. Brooks's history of peremptory strikes in past cases; (b) the "statistical evidence about the prosecutor's use of peremptory strikes against [b]lack prospective jurors in the case"; (c) "[Ms.] Brooks'[s] reasoning for striking [Juror] Davis as compared to two white jurors who were not struck"; and (d) Ms. Brooks's response to Sockwell's *Batson* objection explaining why she struck Juror Davis.  But the majority opinion overstates the relevance of these circumstances.  Some are not relevant at all.  And others are much less relevant than the majority opinion lets on.

A.  <u>History of Peremptory Strikes in Past Cases</u>

As the first relevant circumstance, the majority opinion says there are "several instances of [Ms.] Brooks striking [b]lack jurors in violation of *Batson* starting in 1988."  Specifically, the majority opinion points to five cases:  *Williams v. State*, 530 So. 2d 881 (Ala. Crim. App. 1988); *Williams v. State*, 548 So. 2d 501 (Ala. Crim. App. 1988); *Powell v. State*, 548 So. 2d 590 (Ala. Crim. App. 1988); *Ex parte Bird*, 594 So. 2d 676 (Ala. 1991); and *Sims v. State*, 587 So. 2d 1271

(Ala. Crim. App. 1991). But, on closer look, there are not several instances of Ms. Brooks striking black veniremembers in violation of *Batson*.

First, as to the *Williams* cases, the trials in both cases were held in May 1985—almost a year before *Batson* was decided. *Compare Williams*, 530 So. 2d at 882 (the defendant was convicted at the first trial on May 1, 1985), *and Williams*, 548 So. 2d at 503 & n.1 (the defendant was convicted at the second trial on May 27, 1985), *with Batson*, 476 U.S. at 79 (decided in April 1986). Ms. Brooks could not have purposefully violated a Supreme Court decision that did not exist until nearly a year later. At the time of the *Williams* trials, *Swain v. Alabama*, 380 U.S. 202 (1965) was the governing law on jury selection, and there was no indication in the *Williams* cases that Ms. Brooks violated *Swain*. Of course, *Batson* applied retroactively to the *Williams* cases because *Batson* was decided while those cases were on direct appeal. But the majority opinion does not explain how the *Williams* cases can establish a "pattern" of Ms. Brooks violating *Batson* during jury selection when there was no *Batson* decision in 1985 for her to violate.

Second, as to *Powell*, we cannot "safely deduce" that Ms. Brooks was the prosecutor who exercised the peremptory strikes in that case. The Alabama Supreme Court explained that a different prosecutor, Bruce Maddox, "used 75% of his peremptory challenges (6 of 8 strikes) to eliminate black veniremembers" in another case, *Parker v. State*. *See Bird*, 594 So. 2d at 681. And, according to the state supreme court, the "same prosecutor involved" in *Parker*

23-13321                Luck, J., dissenting                    5

"was also involved" in *Powell*.  *See Sims*, 587 So. 2d at 1277.  Mr. Maddox was the prosecutor in *Parker*; not Ms. Brooks.[1]

### B.  Statistical Evidence

As the second relevant circumstance, the majority opinion says that the "statistical information establish[ing] a pattern of striking qualified [b]lack jurors far more often than qualified white jurors" was "strong evidence" the Alabama Supreme Court had to consider.  But the statistical evidence was strong only because the majority opinion skipped over three bits of critical information.

First, black jurors made up seventeen percent (rounding up) of the jury, which wasn't far off from the twenty-four percent (rounding up) that made up the jury pool.  Sockwell's jury, that is, largely reflected the makeup of the venire.  *Cf. United States v. Hill*, 643 F.3d 807, 838 (11th Cir. 2011) (finding no *Batson* violation where forty-one percent of the venire was black and, after the government

---

[1]  We have additional reasons to be skeptical.  The list of cases in the majority opinion showing "several instances of [Ms.] Brooks striking [b]lack jurors in violation of *Batson*" is largely borrowed from page fifty-two of Sockwell's brief.  On the same page, Sockwell also includes *Ex parte Yelder*, 630 So. 2d. 107 (Ala. 1992).  In *Yelder*, he writes, "the Alabama Supreme Court vacated a conviction where [Ms.] Brooks struck 24 of 27 black veniremembers."  But Sockwell is demonstrably wrong.  While *Yelder* does not mention who exercised the peremptory strikes, the prosecutor in that case was a man, not a woman.  *See Yelder v. State*, 630 So. 2d 92, 98 (Ala. Crim. App. 1991), *rev'd sub nom. Yelder*, 630 So. 2d at 110 (referencing "the prosecutor[]" and the "reasons for *his* strikes of black prospective jurors" (emphasis added)).

exercised nine of its fourteen strikes against black veniremembers, fifty percent of the jury was black).

Second, "the presence of [black] jurors," we've explained, "is a significant factor tending to prove the paucity of the [*Batson*] claim." *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995). "[T]he unchallenged presence of two blacks on the jury," as there was here, "undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used [seventy-five percent of the] peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates." *United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir. 1986); *see also Valle v. Sec'y for the Dep't of Corrs.*, 459 F.3d 1206, 1213 (11th Cir. 2006) (concluding that the Florida Supreme Court did not unreasonably apply *Batson* partly because "two blacks served as jurors and a third serve[d] as an alternate" (alteration adopted)).

Third, unlike the prosecutor in *Dennis*, Ms. Brooks used far less than seventy-five percent of her peremptory challenges to strike black veniremembers. Ms. Brooks had fifteen peremptory strikes. Of those fifteen, she used seven—a little less than fifty percent—to strike white veniremembers and eight—a little more than fifty percent—to strike black ones. Put another way, Ms. Brooks used almost as many strikes on white veniremembers as she did on black ones. *See United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990) (finding no *Batson* violation where "[t]he prosecutor struck three black jurors[ but] he also struck two white jurors").

23-13321                   LUCK, J., dissenting                   7

C.  <u>The Reasons for Striking Juror Davis as Compared to White Jurors</u>

As a third relevant circumstance that the Alabama Supreme Court had to consider, the majority opinion compares Juror Davis's "vague answers about pretrial publicity" during voir dire to the answers "two white jurors—Lisa Burch and Peggy McFarlin"—gave about pretrial publicity.  Juror Burch and Juror McFarlin "also did not remember in detail what they heard," the majority opinion explains, which "suggests that the vagueness of [Juror] Davis'[s] answer was only pretextual because [Ms.] Brooks did not strike [Juror] Burch or [Juror] McFarlin."  But Juror Davis's voir dire answers were not the same as the answers given by Juror Burch and Juror McFarlin.  Looking at the voir dire shows the difference.

Here was Juror Davis's voir dire answers to the court's questions about pretrial publicity:

| The court: | Your name, please? |
| Juror Davis: | Eric Davis. |
| . . . | |
| The court: | Have you heard or read from any source anything about these circumstances that we're here today on? |
| Juror Davis: | I've heard a little something. |
| The court: | Okay.  Have you heard or read or from any other source gained any information as to whether or not this defendant was guilty or not? |

| | |
|---|---|
| Juror Davis: | Now, I had heard something. |
| The court: | You haven't? |
| Juror Davis: | I had heard something. |
| The court: | What did you hear and where was it from? |
| Juror Davis: | Oh, I just, um, it was something in the newspaper or something. |
| The court: | Well, what did you hear in the newspaper or read in the newspaper? |
| Juror Davis: | Well, I just, you know, just heard talk about what they had heard in the newspaper or something like that. I didn't read it for myself. |
| The court: | From somebody you heard? |
| Juror Davis: | Um-hum, yes. |
| The court: | When did you hear that? |
| Juror Davis: | It's been a while back. |
| The court: | About how long ago? |
| Juror Davis: | Several months ago. |
| The court: | Several months ago. Did you hear specifically about this defendant right here? |
| Juror Davis: | No. |
| The court: | Okay. Do you remember what you heard? |
| Juror Davis: | Not exactly. |
| The court: | Can you remember it for me the best you can? |
| Juror Davis: | Um, the only thing I recall is just, you know, um, listening at some |

|  |  |
|---|---|
|  | of the guys, you know, that said they had read about it, you know, the incident out on Troy Highway, stuff like that, you know, what had happened and so forth, you know. |
| The court: | Okay. Do you feel like you'd be able to put aside whatever you had heard some of the guys say about what they had read and listen to the facts as they come to you in [c]ourt and based on those facts and those alone make a fair, honest, conscientious impartial decision on guilt and non guilt based on those facts and the law as instructed to you by the [c]ourt? |
| Juror Davis: | Yes, I can. |

Compare Juror Davis's voir dire answers to Juror Burch's answers to similar questions:

|  |  |
|---|---|
| The court: | What's your name, please? |
| Juror Burch: | Lisa Burch. |
| The court: | Ms. Burch, have you heard or read or do you have some knowledge about the circumstances of this case? |
| Juror Burch: | A while back. I mean, I heard it on the news, but it was, you know, just briefly. |

10                          LUCK, J., dissenting                    23-13321

| The court: | Have you ever heard or read or from any source gained any information as to whether or not this defendant was guilty or not guilty? |
|---|---|
| Juror Burch: | No, uh-huh. |
| The court: | Okay.  Do you feel like you'd be able to put whatever you may have heard or read—News source is the only source you have, that you may have heard? |
| Juror Burch: | Um-hum, just on the news. |
| The court: | Do you feel like you'd be able to put that aside and listen to the facts in [c]ourt and make a fair, just, and impartial determination of this case based on the facts as you hear 'em in [c]ourt and the law as instructed to you by the [c]ourt? |
| Juror Burch: | Yes, sir.  I really can't even remember in full detail what I heard at that time. |

And Juror McFarlin's answers:

| The court: | Your name, please? |
|---|---|
| Juror McFarlin: | Peggy McFarlin. |
| . . . | |
| The court: | Have you read or heard something about this matter? |
| Juror McFarlin: | In the paper. |

| The court: | Okay. Have you read or heard anything about it, or from any source gained any information as to whether or not this defendant was guilty or not guilty? |
|---|---|
| Juror McFarlin: | I don't remember. This happened about a month or two ago, didn't it? I'm not sure. |
| The court: | Well, do you remember hearing or reading anything about whether or not this defendant, Michael Sockwell, was guilty or not guilty? |
| Juror McFarlin: | I can't—I don't remember. I just barely remember the story, but I don't remember how it ended. |
| The court: | Okay. So, are you telling me— |
| Juror McFarlin: | I don't know what— |
| The court: | Do you have any opinion toward whether or not this defendant would be guilty or not guilty right now from any source? |
| Juror McFarlin: | I don't really know what the story was really about, really. I just read a little bit of it in the paper and I don't know what he's done. |
| The court: | Well, whatever you've read, do you think like you'd be able to put it aside and listen to the facts as you hear 'em in [c]ourt and based on those facts as you hear |

them in [c]ourt and the law as in-
structed to you by the [c]ourt
make a fair, impartial, and just de-
cision in this case.

Juror McFarlin:      I think I could.

The court:           Okay.  Thank you.

Juror Davis's answers about pretrial publicity were not the same as Juror Burch and Juror McFarlin's answers.  Juror Davis, for example, gave vague answers about where he heard information regarding the murder-for-hire scheme.  He initially testified that he "heard something."  Only when pressed by the trial court did he say that he heard about the crime from "the newspaper or some-thing."  Then later, when pressed again by the trial court, Juror Davis testified that he was "listening at some of the guys" and "heard talk about what they had heard" but "didn't read it for" himself.  Juror Burch and Juror McFarlin, on the other hand, were clear from the get-go about where they heard information on the case.  Juror Burch told the trial court that she heard information about the murder "on the news."  And Juror McFarlin testified that she read about the scheme "[i]n the paper."

Juror Davis also initially gave a vague answer about what he heard regarding Sockwell's participation in the murder-for-hire scheme.  At first, Juror Davis said he "had heard something" about "whether or not this defendant was guilty or not."  Then he later changed his answer to say that he heard nothing "specifically" about Sockwell.  But Juror Burch and Juror McFarlin did not flip-flop their answers when asked about what they knew about

Sockwell's involvement in the murder. Juror Burch told the trial court "[n]o" when asked the same question whether she heard or read "any information as to whether or not this defendant was guilty or not guilty." And Juror McFarlin testified that she had "just read a little bit of it in the paper" and "d[id]n't know what [Sockwell]'s done."

D.  Ms. Brooks's Response About the Strike After Sockwell's *Batson* Objection

As a final relevant circumstance, the majority opinion points to this snippet from Ms. Brooks's response to Sockwell's *Batson* objection: "[Juror] Davis, according to my notes, is a black male, approximately twenty-three years of age, which would put him very close to the same race, sex, and age of the defendant." This snippet, the majority opinion says, "supports that [Ms.] Brooks felt as if [Juror] Davis would be partial to [Sockwell] because of their shared race." But the majority opinion overlooks the context of Ms. Brooks's explanation and the rest of the voir dire.

Turning to the rest of the voir dire, after Sockwell made his *Batson* objection, the trial court called on Ms. Brooks to explain her reasons for using her peremptory challenges. In her response, Ms. Brooks went through each struck veniremember, giving the veniremember's race, sex, and, sometimes, age, and then explaining her reasons for the strike. The pattern was clear. Here was Ms. Brooks explaining her first strike, giving the race and sex of the veniremember and then her reason for the strike:

> [T]he [s]tate's first strike was juror number ninety-four. She was a white female. Primary reason for striking her was she was opposed to the death penalty under any circumstances, generally opposed, she's opposed, it was possible she could do it but it was also possible she would be impaired and it would be real hard. In addition, she was dressed in a sweatshirt, extremely casually.

Here she was explaining her second strike, giving the race, sex, and age of the veniremember and then her reason for the strike:

> We struck as our second strike number one oh eight, a black male, eighty-one years old, according to our record. The [c]ourt might recall when he came into individual voir dire he sat at the end of the table and the [c]ourt said something to him and he looked up and couldn't find the [c]ourt, and the [c]ourt said here I am, over here. He also did not understand the [c]ourt's questions about the death penalty. He said he might give it under certain facts but he was generally opposed.

Here's her third strike doing the same thing: "The [s]tate struck juror number one twenty-two, a white male. The primary reason because he said he was opposed [to the death penalty] under most circumstances, he would have to think about it, possibly he could give it. Our challenge for cause was denied as to him." And her fourth:

> We struck number thirty-three next. Mr. Clayton was a black male. Our records indicate in February of '79

> a fraud based on insufficient funds, in '86 a harass-
> ment conviction, in '86 criminal trespass, and he said
> under the death penalty question he was opposed un-
> der any circumstances, that he opposed it in general
> and that he didn't really think he could give it. We
> struck him for those reasons.

And so on the pattern went for each juror she struck.

Ms. Brooks used the same pattern for Juror Davis as she did
for the other challenged jurors:

> Okay. Mr. Davis, according to my notes, is a black
> male, approximately twenty-three years of age,
> which would put him very close to the same race, sex,
> and age of the defendant. He had said to the [c]ourt
> he had heard a little something. The [c]ourt ques-
> tioned him further and he finally said well, I heard it
> from the paper or something. The [c]ourt questioned
> him further. He was very vague and unclear in his
> answer. The [c]ourt asked him more about it and he
> said well, some people were talking about it. I didn't
> actually read it. He could not remember what had
> been said nor anything about—anything further
> about those. His answers to the death penalty did not
> give me a lot of clues either way as to how he felt. In
> fact, I think the words he used were I could go either
> way.

Reading the voir dire as a whole, as we must, Ms. Brooks
didn't mention race as the reason for striking Juror Davis. She men-
tioned Juror Davis's race, sex, and age, as she did for the other chal-
lenged jurors—white and black—to describe and identify the

veniremember for the trial court before she gave her reasons for the strike.

> 2. *The Alabama Supreme Court Did Not Ignore the Four Relevant Circumstances*

"After carefully reviewing the record as it relates to the prosecutor's preemptory strikes," the Alabama Supreme Court found that the strike of Juror Davis was not based on purposeful discrimination. *Sockwell II*, 675 So. 2d at 42. The majority opinion does not afford AEDPA deference to this finding because it agrees with Sockwell that the Alabama Supreme Court "ignored" the four relevant circumstances. But the majority opinion is wrong. The Alabama Supreme Court considered all the relevant circumstances in making its finding, as it was required to do as part of *Batson*'s third step.

In his brief on appeal to the Alabama Supreme Court, Sockwell relied on the same four relevant circumstances he proffers here. First, Sockwell cited Ms. Brooks's history of peremptory strikes: the Alabama appellate courts had "condemned this same prosecutor personally for racially discriminating against [black] venire[]members in criminal trials through her use of peremptory strikes." Second, Sockwell listed the statistical evidence: the "use of peremptory strikes against black venire[]members was highly disproportionate to their representation in the venire." Third, he compared the reasons Ms. Brooks gave for striking Juror Davis to two white jurors: the "claim that she struck Juror Davis even in part based on the vagueness of his recollection of pretrial publicity

is undermined by the fact she declined to challenge two white ve-nire[]members who also evidenced uncertainty or confusion about what they had heard or read about Mr. Sockwell's case." Fourth, Sockwell discussed Ms. Brooks's response to his *Batson* objection: Ms. Brooks admitted "that she struck Juror Davis because he was black."

The Alabama Supreme Court did not ignore Sockwell's brief and the four relevant circumstances. First, it "carefully reviewed the record" and "the extensive briefs from Sockwell and the [s]tate." *Id.* at 39. Second, the Alabama Supreme Court cited the statistical evidence and the strikes of other black veniremembers. *See id.* at 40–41. Third, the court reviewed the voir dire testimony of white veniremembers who were not struck from the jury and compared it to the testimony of black veniremembers who were challenged. *Id.* at 40–42. Fourth, it discussed Ms. Brooks's re-sponse to Sockwell's *Batson* objection and "consider[ed] the entire context of the prosecutor's explanation." *Id.* And fifth, the Ala-bama Supreme Court emphasized that it had "thoroughly consid-ered each issue Sockwell ha[d] raised," "independently searched the record for reversible error," and "consider[ed] the applicable law as it relates to the facts of this case." *Id.* at 42.

What the Alabama Supreme Court did was more than enough. State courts are not required "to show their work in *Bat-son* determinations by mentioning every relevant circumstance." *King*, 69 F.4th at 869. "This no-grading-papers, anti-flyspecking rule stems from the presumption that state courts know and follow the

law and [AEDPA's] highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Id.* (cleaned up).

Thus, "[a] petitioner must do more than prove the state court failed to mention evidence in order to prove that the state court failed to consider that evidence." *Id.* (quotation omitted). He must show the state "court clearly limited its review to some circumstances and did not implicitly review the circumstances [the petitioner] proffers." *Id.* (quotation omitted). Where the state court's opinion "does not specifically address each of the arguments advanced by [the petitioner], we cannot assume that the court failed to consider all of the arguments [the petitioner] presented." *Trawick v. Allen*, 520 F.3d 1264, 1267 (11th Cir. 2008).

Sockwell did not do more than prove the Alabama Supreme Court failed to mention each of the relevant circumstances he proffered, which is not enough to show an unreasonable application of *Batson*. Sockwell does not argue that the state supreme court clearly limited its review to some circumstances and did not implicitly review others. And there's nothing in the Alabama Supreme Court's opinion suggesting that it did not consider all the relevant circumstances.

To the contrary, the Alabama Supreme Court explicitly addressed the bulk of the relevant circumstances Sockwell proffered. And the court made clear that it "thoroughly considered each issue Sockwell ha[d] raised," *Sockwell II*, 675 So. 2d at 42, which included the four relevant circumstances. We don't have to presume the

state supreme court considered the circumstances cited by Sock-well.  The Alabama Supreme Court explicitly told us that it did.

### 3. *Fairminded Jurists Could Conclude that the Strike of Juror Davis Was Not the Result of Purposeful Discrimination*

The majority opinion does not give AEDPA deference to the Alabama Supreme Court's no-purposeful-discrimination finding for a second reason:  "a reasonable and fairminded jurist could not have considered" the four relevant circumstances "and concluded that *Batson* was not violated."  But when faced with the same four relevant circumstances as Sockwell has proffered here—separately and together—we have held that reasonable and fairminded jurists could conclude that there was no *Batson* violation.

Beginning with *Hightower v. Schofield*, 365 F.3d 1008 (11th Cir. 2004), *cert. granted, judgment vacated*, 545 U.S. 1124 (2005), *opinion reinstated sub nom. Hightower v. Terry*, 459 F.3d 1067 (11th Cir. 2006), the statistical evidence in that case showed the prosecutor used more than eighty-five percent of his strikes—six of seven—to challenge black veniremembers; "the prosecutor had in the past shown a bent and scheme to keep down the low number of blacks on either the grand jury or regular panels," *id*. at 1031 (quotation omitted); and "the prosecutor did not strike white jurors who were as lukewarm on the death penalty as the black jurors he struck," *id*. at 1034.  The Georgia Supreme Court determined that the "trial judge was not clearly erroneous in finding that the prosecutor had articulated legitimate non-racial reasons for his challenges, and that the prosecutor had not in fact discriminated."  *Id*. at 1033 (quotation

omitted).  Applying AEDPA deference and reviewing all the relevant circumstances, we concluded that the state supreme court's finding did not "run afoul of federal law." *Id*. at 1035.

Next, in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005), "the district attorney's office that handled [the] prosecution ha[d] a history of racial discrimination." *Id*. at 1310.  The petitioner provided a "list of cases in which convictions obtained by this district attorney's office ha[d] been reversed or criticized on the basis of *Batson*." *Id*. at 1312.  Even with this relevant circumstance, the state court found that the strikes of black veniremembers "were not racially motivated." *Id*. at 1311.  Applying AEDPA, we could not "conclude that the state court decision was based on an unreasonable determination of facts in light of the evidence presented to the state court." *Id*. at 1313.

Then, in *Valle*, the state used more than eighty-eight percent of its peremptory strikes—eight of nine—to strike minority jurors ("six blacks and two Hispanics"). 459 F.3d at 1212 (quotation omitted).  Despite the statistical evidence, the Florida Supreme Court found that the petitioner "failed to show that it is likely the challenges were used in a racially discriminatory manner." *Id*. at 1213 (quotation omitted).  Applying AEDPA deference, we concluded that the Florida Supreme Court's determination was "not contrary to, nor an unreasonable application of, clearly established federal law." *Id*.

*Trawick* involved a slightly different *Batson* challenge based on gender discrimination.  520 F.3d at 1266.  There, statistical

information showed that the prosecutor used almost eighty per-
cent of the peremptory strikes—eleven out of fourteen—on
women; the prosecutor's office had a "history of discrimination in
peremptory strikes," *id.* at 1267; and "two women stricken from
the venire offered similar answers to men who were chosen for the
jury in response to a single question regarding media exposure," *id.*
at 1268. Still, "review[ing] the record and based thereupon," we
could not "say that the Alabama Supreme Court's ultimate conclu-
sion was contrary to or involved an unreasonable application of
federal law." *Id.* at 1269.

Parker v. Allen, 565 F.3d 1258 (11th Cir. 2009), like *Hightower*,
*McNair*, and *Valle*, involved a more traditional race-based *Batson*
challenge. The statistical evidence in *Parker* showed that "the pros-
ecution struck eight of nine qualified black venire[]members"—
more than eighty-eight percent. *Id.* at 1267. The prosecution said
it was striking those eight veniremembers because: of their "gen-
eral opposition to the death penalty"; they had "taken psychology
classes or training"; they "were related to someone who had been
charged with a crime"; and they "had a series of traffic offenses and
arrests." *Id.* at 1267–68 (quotations omitted). But "[e]ight of the
eleven white seated jurors were, however, related to someone who
had been convicted of a felony, had taken a psychology course, . . .
or had been convicted of more than one traffic offense." *Id.* at
1268. Even so, the state court "did not find that there was a signif-
icant disparate treatment of the venire[]members with the same
characteristics." *Id.* at 1270 (cleaned up). After reviewing "the state
court's application of the law, acceptance of the prosecutor's stated

reasons for his strikes, and consideration of the differences in the situations of the stricken and seated jurors," we agreed that "the state court reasonably applied *Batson*." *Id.* at 1272.

In *Greene v. Upton*, 644 F.3d 1145 (11th Cir. 2011), the prosecutor struck a black veniremember who "had a cousin with a cocaine problem," but did not strike white jurors who "knew people or had relatives who had taken drugs." *Id.* at 1156. The prosecutor struck a black veniremember who "failed to return to court for jury selection," but did not strike two white jurors who "also failed to appear on the first day of jury selection." *Id.* And the prosecutor struck a black veniremember "who really wouldn't have anyone to take care of her child," but did not strike a white juror who had child-care issues because "her husband worked out of town." *Id.* (cleaned up). Applying AEDPA deference, we concluded that "the record supports the *Batson* determinations of the Supreme Court of Georgia." *Id.* at 1155.

In *Wellons v. Warden, Georgia Diagnostic and Classification Prison*, 695 F.3d 1202 (11th Cir. 2012), the prosecutor used peremptory strikes to remove seventy-five percent—three of four—of the black veniremembers. *Id.* at 1207. And, although the prosecutor struck three black veniremembers because of their views about the death penalty, the petitioner "point[ed] to four hesitant [white] jurors that despite their hesitancy about the death penalty were selected for the jury." *Id.* The Georgia Supreme Court found that the prosecutor did not purposefully discriminate in striking the black veniremembers. *Id.* "Considering this record," we

concluded, "it was not unreasonable for the Georgia Supreme Court to find that [the petitioner] did not prove purposeful discrimination by the state." *Id*. at 1208–09.

In *Madison v. Commissioner, Alabama Department of Corrections*, 761 F.3d 1240 (11th Cir. 2014), we acknowledged as "strong," "[r]elevant factors supporting purposeful discrimination" that: "the prosecutor peremptorily struck 6 of 13 eligible black jurors"; "[t]he prosecutor refused to give reasons for his strikes at trial, despite being asked to do so . . . ."; and "the Mobile County District Attorney's Office[ had a] well documented history of racially discriminatory jury selection, including at [the petitioner's] first trial." *Id*. at 1252. Yet, we held that the district court's finding that the prosecutor did not engage in purposeful discrimination was a "plausible[] view of the evidence." *Id*. at 1255.

Perhaps the closest case to this one is *King*. *King* had the same four relevant circumstances: a history of prior peremptory strikes based on race; statistical evidence showing a disproportionate exclusion of black veniremembers; striking black veniremembers who gave the same voir dire responses as white jurors who were not struck; and a prosecutor's racially charged response to a *Batson* challenge.

As to the history of prior peremptory strikes, earlier in the petitioner's trial, when the prosecutor struck a black veniremember, "[t]he trial court concluded that" the prosecutor's "proffered reason for striking" the black veniremember "was not credible and ruled that this strike was unconstitutional under *Batson*." *Id*. at

881–82 (Wilson, J., dissenting); *see also id.* (Wilson, J., dissenting) ("[J]ust as a prosecutor's discriminatory strikes in other cases can suggest they acted discriminatorily in this case, a finding of discriminatory intent within the same trial is also probative."). As to the statistical evidence, after the prosecutor used all of his strikes, eight percent "of the jurors were black (i.e., only one black juror) and" ninety-two percent "were white (i.e., eleven white jurors)." *Id.* at 883 (Wilson, J., dissenting). As to the disparate treatment of black and white jurors, the prosecutor struck a black veniremember because she was a minister, but the prosecutor did not strike a white veniremember who also was a minister. *Id.* at 872. And the prosecutor struck black veniremembers who had connections to the petitioner's family, but he did not strike white jurors who also had connections to the petitioner's family. *See id.* at 872–73. Finally, in his response to the petitioner's *Batson* objection, the prosecutor "show[ed] his hostility and disdain for having to comply with *Batson*." *Id.* at 882 (Wilson, J., dissenting). His "rants demonstrated . . . that he was reluctant to abide by the requirements of *Batson*" and he "would continue to violate *Batson* if it weren't for the enforcement mechanisms put in place by the courts." *Id.* (Wilson, J., dissenting). Still, despite these four relevant circumstances, we concluded that "[t]he Georgia courts reasonably applied *Batson* when they rejected [the petitioner's] remaining objections." *Id.* at 873.

\*   \*   \*   \*

To summarize, even where the petitioner proves as a relevant circumstance that there was a history of peremptory strikes

based on race, in *Hightower*, *McNair*, *Trawick*, and *Madison*, we held that a fairminded jurist could conclude that the strike of a black veniremember was not the result of purposeful discrimination. And even where the petitioner proffers statistical evidence as a relevant circumstance that the prosecutor engaged in a pattern of strikes against black veniremembers, in *Hightower*, *Valle*, *Trawick*, *Parker*, *Wellons*, and *Madison*, we explained that a fairminded jurist could conclude the peremptory challenge of a black veniremember was not based on race. And even where the petitioner shows as a relevant circumstance that the prosecutor struck a black veniremember based on one characteristic that was shared by a white juror who was not struck, in *Hightower*, *Trawick*, *Parker*, *Greene*, and *Wellons*, we concluded that a fairminded jurist could find that there was no purposeful discrimination. And even where the petitioner shows the prosecutor didn't give a valid reason for striking the black veniremember in response to the *Batson* objection, in *Madison*, we concluded that a fairminded jurist could find no *Batson* violation. If fairminded jurists in *Hightower*, *McNair*, *Valle*, *Trawick*, *Parker*, *Greene*, *Wellons*, and *Madison* could find no purposeful discrimination even with these relevant circumstances, then the Alabama Supreme Court could make the same finding with the same circumstances.[2]

---

[2] Other than *King*, the majority opinion does not meaningfully engage with these "troublesome" cases. That's understandable given that, in each case, we concluded fairminded jurists could find no purposeful discrimination despite

*King* had all four circumstances, and each one was more rel-
evant to the *Batson* inquiry than Sockwell proffers here.  First, Sock-
well alleged that Ms. Brooks had a history of making race-based
peremptory challenges in other cases.  But, in *King*, the prosecutor
had a history of making a race-based peremptory challenge *in the
petitioner's case*.    The *King* prosecutor was found to have

---

"instances upon instances of prosecutors purposefully striking huge swath[s]
of [b]lack jurors and flimsy reasons for striking those [b]lack jurors."

Instead, in a single sentence inside a single footnote, the majority opinion says
that "none of th[e]se cases involved [1] a direct comparison of the defendant
to a stricken [j]uror *and* [2] a state supreme court calling out the prosecutor by
name and the office for serial *Batson* violations."  But Sockwell's case also did
not involve a direct comparison to Juror Davis.  As the Alabama Supreme
Court found, Ms. Brooks's "opening remark," "given the context of the entire
exchange," "was merely a descriptive identification of the veniremember
based on the prosecutor's notes."  *Sockwell II*, 675 So. 2d at 40.  This finding is
presumed correct.  *See King*, 69 F.4th at 867.

And we called out by name the prosecutor and district attorney's office for
serial *Batson* violations in *Hightower* and *Madison*.  In *Hightower*, defense
"[c]ounsel presented a newspaper article about *State v. Amadeo*, a case which,
they claimed, arose out of a memo" which "Hightower's prosecutor, Joseph
Briley had admitted to being the author of," and "which detailed a purpose
and plan to limit the number of African-Americans serving on grand juries."
365 F.3d at 1031 & n.46 (quotations omitted).  And, in *Madison*, we noted as a
"[r]elevant factor[]" "the Mobile County District Attorney's Office's well-doc-
umented history of racial discriminatory jury selection, including at Mr. Mad-
ison's first trial."  761 F.3d at 1252.  (*McNair* and *Trawick* also called out district
attorney's offices for serial *Batson* violations, but not by name.)  Despite these
relevant factors, we concluded that fairminded jurists could find the prosecu-
tors' strikes were not based on purposeful discrimination.

purposefully discriminated against a black veniremember minutes before he struck more black veniremembers.

Second, even after Ms. Brooks used her peremptory challenges, black jurors still made up about seventeen percent of the jury. But, in *King*, after the prosecutor went through his peremptory strikes, there were less black jurors—only eight percent—serving on the jury.

Third, while Ms. Brooks struck Juror Davis but not Juror Burch and Juror McFarlin, Juror Davis gave vague and inconsistent answers about where he heard information on the murder-for-hire scheme and about what he heard as to Sockwell's participation in the scheme while the other two jurors did not. Yet, in *King*, the prosecutor struck a black veniremember who served as a minister, but not a white juror who served as a minister. And he struck black jurors who had connections to the petitioner and his family, but not white jurors who also had connections to the petitioner and his family.

Fourth, in response to the petitioner's *Batson* objection, Ms. Brooks described Juror Davis's race, age, and sex, and compared them to Sockwell's race, age, and sex, before explaining her reasons for using a peremptory challenge on Sockwell. But, in *King*, in response to the petitioner's objection, the prosecutor "rant[ed]" about "his hostility and disdain for having to comply with *Batson*," which demonstrated "that he was reluctant to abide by the requirements of *Batson*" and that he "would continue to violate *Batson*." *King*, 69 F.4th at 882 (Wilson, J., dissenting).

In other words, with the same four circumstances as this case—each one more relevant for the *Batson* inquiry than here—we concluded in *King* that the "Georgia courts reasonably applied *Batson*." *Id.* at 873. If the Georgia Supreme Court in *King* could find no purposeful discrimination with these four relevant circumstances, then we cannot conclude, as the majority opinion does, that "[n]o reasonable and fairminded jurist could have considered all relevant circumstances and still found no *Batson* violation." It's hard to see how we could apply AEDPA deference to the Georgia court's finding in *King* but not to the Alabama Supreme Court's finding here.

### 4. *Conclusion*

Each premise of the majority opinion is flawed. The four relevant circumstances are not as relevant as the majority opinion says they are. The Alabama Supreme Court considered all the relevant circumstances proffered by Sockwell as required by *Batson*. And a fairminded jurist could find that there was no purposeful discrimination. Because the majority opinion's refusal to give AEDPA deference to the Alabama Supreme Court's no-purposeful-discrimination finding is not supported by the facts and the law, I respectfully dissent.